Filed 3/23/26  In re I.C. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re I.C. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E086602 |
| Plaintiff and Respondent, | (Super.Ct.No. J297130, J297131, J297133) |
| v. | OPINION |
| F.C. et al., | |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County.  Cara D. Hutson, Judge.  Affirmed.

Law Office of Robert McLaughlin and Robert McLaughlin, under appointment by the Court of Appeal, for Defendant and Appellant F.C.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant J.M.

1

Laura Feingold, County Counsel and Landon C. Villavaso, Deputy County Counsel for Plaintiff and Respondent.

In this dependency case, a mother and father appeal from orders terminating their parental rights to their two children and selecting adoption as their permanent plans. Mother also appeals from the termination of her parental rights to a third child, an older half-sibling of the first two. The parents argue the juvenile court erred by failing to apply the beneficial parental relationship exception to adoption. They also challenge the juvenile court's order denying mother's Welfare and Institutions Code section 388 petition without a hearing.[1] We affirm.

FACTS

Defendant and appellant J.M. (mother) has seven children: J.M. (a boy born 2008); E.M. (a girl born 2009); N.M. (a girl born 2011); L.M (a girl born 2013); M.M (a boy born 2014); R.C. (a girl born 2020); and I.C. (a girl born 2022). The three children at issue in this appeal are R.C. and I.C., who are the biological children of defendant and appellant F.C. (father), and their older half-sister L.M. According to mother, L.M.'s alleged father, who is also the alleged father of M.M., has been deported and his whereabouts are unknown.[2]

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The alleged father of J.M. and E.M., as well as the alleged father of N.M., have also been deported and their whereabouts are unknown.

Father and mother "grew up together and are legally stepbrother and sister." As of 2023, mother and father resided with five of mother's seven children; N.M. and E.M. lived with other family members. Mother, father, and the five children lived on a property owned by mother's father (maternal grandfather) and his wife, who is father's mother. A maternal aunt, a maternal uncle, and a paternal uncle also lived on the property, which includes a "'main house'" and two garages that have been converted into living spaces. Mother and father's bedroom was in one of the garages, which they shared with the infant I.C. J.M., M.M., and the maternal uncle shared two mattresses placed together in the other separate garage, which also had a small separate room used by the paternal uncle.

All seven children were detained from parental custody in May 2023. M.M. and L.M. had exhibited sexualized behaviors at school. When interviewed, M.M. described sexual abuse of both himself and J.M. by the maternal uncle; he said the maternal uncle and J.M. would "'make weird noises and watch sex videos.'" The maternal uncle had "done weird things to him but mostly to [J.M.]." M.M. said that "when the uncle and [J.M.] are doing weird things, [M.M.] acts like he is asleep or goes on his phone." M.M. "would not provide details regarding the 'weird things'" but he "indicated that he knew what sex was and that the maternal uncle and [J.M.] watch stuff with sex." M.M. said mother, father, and the paternal uncle knew about the "'weird things.'" He said mother "'was mad'" but then "immediately retracted and said, 'no, she didn't get mad.'" He said father had talked to the maternal uncle "and told him to stop." In a later interview with

law enforcement, M.M. "disclosed that the maternal grandfather hits him in his private parts and also does 'weird things' to him." Mother denied any sexual abuse of the children.

The department's decision to detain the children out of parental custody was also motivated by concerns about substance abuse and domestic violence.[3] E.M. was living with her paternal grandmother, who told a social worker E.M. "has disclosed witnessing domestic violence and alcohol abuse in the home" by mother, father, and maternal grandfather. When M.M. was interviewed by law enforcement, he became "extremely emotional" and said he was worried about mother because father and maternal grandfather "often" hit her. Also, L.M. told a social worker that mother and father "drink beer and then fight after drinking."

During the department's investigation, social workers were concerned about maternal grandfather's control over mother, as well as the rest of the family. Mother "had to ask permission to make any type of decision regarding her children." E.M. reported that maternal grandfather had coached the children on the way to the department's office for an interview, telling them "not to say anything about [J.M.] not attending school." When a social worker tried to assess the family home at a time when maternal

---

[3] The detention report also discusses department concerns that J.M. and M.M. were being forced to work for maternal grandfather's landscaping business rather than going to school, as well as general neglect based on M.M.'s dirty clothes and poor hygiene. Mother denied the children were forced to work, and she said M.M. "just doesn't like to shower." The dependency petitions at issue here, however—as to R.C., I.C., and L.C.—include no allegations based on those concerns.

grandfather was not there, mother, father, and the paternal uncle would not allow the social worker to enter the property because maternal grandfather "owned the home and 'said no.'" When L.M. was asked about maternal grandfather "controlling all of the adults" she said "'[h]e doesn't control them. They just all ask for his opinion on everything . . . (for example) what foods the adults can feed us because grandpa knows what we need and like.'" When presented with the department's concerns about maternal grandfather's controlling behavior, mother said: "He is just overprotective. He loves me. He helps me understand when I can't read or understand something." The department offered mother "shelter resources due to concerns for emotional abuse by the maternal grandfather; however, [she] declined."

The section 300 dependency petitions for R.C. and I.C., filed in May 2023, alleged they came within subdivision (b)(1) (failure to protect) because of mother and father's histories of ongoing domestic violence and unresolved substance abuse. The petitions also alleged they came within subdivision (j) (abuse of sibling) because mother knew or should have known the maternal uncle was sexually abusing J.M. and M.M and she failed to protect them. L.M.'s dependency petition included analogous allegations under subdivisions (b)(1) and (j) as to mother, plus allegations under subdivisions (b)(1) and (g) (no provision for support) based on her alleged father's whereabouts being unknown. The juvenile court detained the children out of parental custody per the department's recommendation. The court ordered the children to have no contact with the maternal uncle or maternal grandfather.

5

In September 2023, the department filed amended dependency petitions for L.M., R.C., and I.C., adding allegations of physical abuse by mother against L.M., father failing to protect M.M. and J.M. from sexual abuse by the maternal uncle, and sexual abuse of E.M. by father. She said that these beatings would leave redness and bruising on their bodies. E.M. also said that on one occasion father made her orally copulate him. When she told her mother what father had done, mother had her tell maternal grandfather. When she did, maternal grandfather called father into the room and asked him about the allegation; father denied it. Mother then "hit [E.M.] with a belt and told her to never make up stuff like that." Also, E.M. said mother "once told her that she felt that [father] was giving her too much attention and accused [E.M.] of liking [father] in a romantic way." The parents implemented rules to limit E.M.'s contact with father, including sending her to her room once he came home from work. This rule was so strictly enforced that E.M. was unable to leave her room to use the toilet, and as a result "she ended up urinating on herself on multiple occasions." If E.M. had to be in a space with father, such as in a car, she had to keep her head down and was not allowed to look at him. Shortly after mother's accusation, E.M. "was forced to leave the home and live with her paternal grandmother."

At the jurisdiction and disposition hearing in March 2024, the juvenile court found true all the allegations in R.C., I.C., and L.M.'s amended dependency petitions and removed them from parental custody. Specifically, the court found R.C. and I.C. came within section 300, subdivisions (b)(1), based on mother's and father's histories of

6

substance abuse and ongoing domestic violence, and (j), based on mother and father failing to protect J.M. and M.M. from sexual abuse by the maternal uncle, father sexually abusing E.M., and mother failing to protect E.M. from sexual abuse by father. It found L.M. came within section 300, subdivisions (a) (serious physical harm), based on physical abuse by mother, (b)(1), based on mother's history of ongoing domestic violence and substance abuse, mother's physical abuse, and L.M.'s alleged father's absence, (g), based on L.M.'s alleged father's absence, and (j), based on mother's failure to protect J.M. and M.M. from sexual abuse by the maternal uncle. The court ordered reunification services for mother and father, and it ordered father to have supervised visitation with R.C. and I.C.

The court at first denied mother visitation because it would be detrimental, but it ordered the department to make a submission addressing "mother's psychological assessment, therapy, and re-assessment for visitation." The court in June 2024 accepted the department recommendation and reinstated visitation for mother with R.C., I.C., and L.M.

In July 2024, the department reported that L.M., after an adjustment period, had been "thriving" with her caregivers, who are maternal great-grandparents and are also the caregivers for N.M. R.C. and I.C. were placed with a foster family. I.C. was "walking and meeting all her milestones." R.C.'s speech was delayed, but she was attending speech therapy and her caregivers were teaching her sign language. There were "no emotional concerns" for R.C. or I.C.

7

As of July 2024, mother and father were both working full time for maternal grandfather's landscaping business. They had been in a "committed relationship . . . for over five years" and were "planning to get married sometime in the future." They both described their relationship as improved over a year earlier. They continued to live together in the separate building on maternal grandfather's property; mother said they were "looking for a place of their own but having trouble finding a place due to low credit." They were both participating in services and making some progress on their case plans. Father had visited regularly with the R.C. and I.C., and the visits went well. Mother's visits had only recently been reinstated, but she had visited with R.C., I.C., and L.M. once, and a second visit had been scheduled. The social worker described the visit as "appropriate" and raising "no concerns."

In October 2024, the department recommended R.C., I.C., and L.M. remain in their placements, that the parents' reunification services be terminated, and that a section 366.26 hearing be set. Mother and father had participated in court-ordered services and had benefitted somewhat. They both visited with the children regularly and well. Nevertheless, they continued to demonstrate a "lack of protective capacity" by "continu[ing] to minimize the safety threats that led to CFS involvement." In the department's view, the parents "have not seemed to recognize the impact [of] their lack of progress and effort to secure [a] safe and stable home for the children to return home to." They "continue[d] to involve the maternal grandfather and initially advocated for his rights to visit and services even though they have been advised not to do so and a no

8

contact order was put in place." And they continued "to reside with the maternal grandfather and depend on him for employment and seem[ed] not to have any concerns regarding the safety of the children."

Meanwhile, the children were doing well in their placements. L.M. had "adjusted well to [her] current placement" and was "well bonded to her sibling [N.M.], who also resides in the home." L.M. "expressed a desire to have no change to her current placement as she really likes her current school." R.C. and I.C. had formed a "strong bond" with their foster parents, "calling them mom and dad and [getting] along great with all the other children in the home."

At the contested 18-month review hearing in January 2025, at which both mother and father testified, the juvenile court accepted the department's recommendation to terminate reunification services and set a section 366.26 hearing.

In May 2025, the department recommended parental rights be terminated as to R.C., I.C., and L.M. to free them for adoption by their current caretakers. R.C. and I.C. had been placed with their prospective adoptive parents since June 2023. R.C. expressed that she wanted to stay with her current caregivers "'forever' but wants to continue to see her mom." I.C. was still too young to understand the concept of adoption or express feelings about it. The social workers observed R.C. and I.C. appeared to have a mutually-bonded parent-child relationship with their caretakers and were happy and smiling in their presence and that of the other children in the home. Their caregivers "shared that they have a parent/child relationship" with R.C. and I.C., and "their extended

9

family have become attached to them, as well, and see [them] as part of their family." The girls "fit well into their family and their adopted children already see them as their siblings." L.M., too, was doing well in the home of her prospective adoptive parents, her maternal great grandparents, with whom she had been placed since November 2023. L.M. and the maternal great grandparents had "developed a mutual attachment" and they all "expressed a strong desire to legalize their relationship through adoption."

In May 2025, a department filing described the parents' visitation as mostly positive. The social worker found that "[o]verall, visits are appropriate." The social worker noted, however, that "mother struggles to engage with [L.M.] throughout the visit," because the other children needed more attention, and visitation was "centered around [R.C. and I.C.]." The parents "pride themselves in making visits fun by bringing balls, electric cars, and arts and crafts activities to entertain the kids along with their favorite food and snacks," though the amount of "food, sweets, and drinks" was "always . . . excessive," and R.C. and I.C. "appear to receive more extravagant gifts." The parents were "patient, loving and engage[d] appropriately," but they tended to become "overwhelmed when emotions run high." Mother said R.C. had questioned "why she has to be with another family and cannot go home." The social worker confirmed that R.C. "did appear to be emotional during that specific visit," but that "transition back [to] the caregivers always goes well as she appears to be in good spirits and calls the caregiver . . . 'daddy.'"

10

The department also submitted a bonding study examining mother's relationship with R.C., I.C., and L.M. The psychologist observed that "the children engage in healthy attachment behaviors toward Mother." All three children appeared relaxed and calm in mother's presence, and mother both "initiates affection and responds to [the children's] overtures." She observed "[t]he interactions, laughter, and conversations were endless between the children and Mother." Mother used appropriate discipline and limit-setting measures and responded supportively when the children needed help or direction. She found "the interactions between the children and Mother indicate that a substantial and meaningful relationship exists between them, and that severing contact could be detrimental." Her recommendation was "to consider the consequential, profound relationship observed between the three children and their mother when making any decision regarding the future of each."

In July 2025, mother filed a section 388 petition requesting that reunification services be resumed for six months.[4] She acknowledged that "in the past" she had "allowed a toxic environment to continue with the hopes that it would change," but had since learned she had to "create that change within" herself. According to her declaration, mother had moved into her own residence and was no longer living with father. She said that she and father "keep collaborative communication," but have "set up

---

[4] Mother's section 388 request also asked that the children be "returned to the Mother . . . on Family Maintenance as their permanent plan." The parents do not now argue that the court abused its discretion by summarily denying this aspect of the section 388 petition.

boundaries and plans to ensure our children's happiness and safety." She described her financial situation as "improved," saying she had "steady employment in the landscaping field" and was "capable of providing for all my children." She renounced "the practice of spanking my children for any reason." She was committed to sobriety and avoiding "any negative influences that affect [her] relationships with the children." She cited the "strong bond" she has with the children.[5]

The juvenile court denied mother's petition at the prima facie stage, hearing argument but without an evidentiary hearing. The court said what it "was especially looking toward was an acknowledgment with respect to grandfather which is missing from the report which was a major source of concern regarding why this case was here." For that reason, the court viewed mother as "beginning to acknowledge" the problems that prompted the dependency, but it did not "see the changes that would justify a prima facie showing that is needed to have a full hearing."

At the July 2025 section 366.26 hearing, mother and father asked the court to apply the beneficial parental relationship exception to adoption. The department and counsel for the children supported termination of parental rights to free the children for adoption. The court found the parents' visitation had been consistent and acknowledged the existence of a beneficial parent/child relationship, but it was not persuaded that the benefits of placement in a new, adoptive home were outweighed by the harm to the

_____

[5] Although Mother's declaration states that the bonding study would be "presented to the court at the time of the hearing," mother's counsel decided not to submit the bonding study for consideration with the section 388 petition.

children from losing those parental relationships.[6] The court terminated parental rights and selected adoption as the children's permanent plans.

DISCUSSION

The parents argue the juvenile court erred by denying mother's section 388 petition without an evidentiary hearing and by failing to apply the beneficial parental relationship exception to adoption. We are not persuaded by either argument.

A. *Mother's Section 388 Petition*

"Under section 388, a parent may petition to modify a prior order 'upon grounds of change of circumstance or new evidence.' (§ 388, subd. (a)(1); see Cal. Rules of Court, rule 5.570(a).) The juvenile court shall order a hearing where 'it appears that the best interests of the child . . . may be promoted' by the new order. (§ 388, subd. (d).) 'Thus, the parent must sufficiently allege *both* a change in circumstances or new evidence *and* the promotion of the child's best interests.' [Citation.] [¶] 'A prima facie case is made if the allegations demonstrate that these two elements are supported by probable cause. [Citations.] It is not made, however, if the allegations would fail to sustain a favorable decision even if they were found to be true at a hearing. [Citations.] While the petition must be liberally construed in favor of its sufficiency [citations], the allegations must nonetheless describe specifically how the petition will advance the child's best

---

[6] Referring to *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), the court commented that "because of *Caden C.*, the Court has to look at all three prongs and the Court can only get to prong two and can't get over prong [three] to find a valid exception."

13

interests.' [Citation.]  In determining whether the petition makes the required showing, the court may consider the entire factual and procedural history of the case."  (*In re K.L.* (2016) 248 Cal.App.4th 52, 61-62.)

Once the juvenile court has terminated reunification services, the focus of the dependency proceedings shifts to the child's need for permanency and stability.  (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  "A court entertaining a section 388 petition at this stage in the proceedings 'must recognize this shift of focus in determining the ultimate question before it, that is, the best interest of the child.' [Citation.]"  (*In re N.F.* (2021) 68 Cal.App.5th 112, 121 (*N.F.*).)

Moreover, "to promote the prompt resolution of the child's custody status and her permanent and stable placement, the law sets a presumptive 18-month limit on reunification services."  (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 627 (*Michael G.*); see § 361.5, subd. (a)(3)(A) ["court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from physical custody of the child's parent or guardian"].)  Where, as here, the parent has reached that 18-month limit, the court nevertheless has "the discretion under section 352 to continue a section 366.26 permanency planning hearing—and in the meantime, to extend reunification services past the 18-month mark—in extraordinary cases."[7]  (*Michael G.*, at p. 634.)  "'Extraordinary circumstances exist when "inadequate

_____

[7]  "Section 352 provides that courts may 'continue any hearing' under the dependency law 'beyond the time limit within which the hearing is otherwise required to be held' (§ 352, subd. (a)(1)), provided there is 'good cause' (*id.*, subd. (a)(2)) and a

*[footnote continued on next page]*

14

services" are offered by the child welfare agency or "an external force over which [the parent has] no control" prevented the parent from completing a case plan.' "[8] (*Michael G.*, at p. 632.)

"'Whether the juvenile court should modify a previously made order rests within its discretion, and its determination may not be disturbed unless there has been a clear abuse of discretion.' [Citation.]" (*N.F.*, *supra*, 68 Cal.App.5th at p. 120; see also *In re D.N.* (2020) 56 Cal.App.5th 741, 756 [decision to deny continuance of § 366.26 hearing under § 352 reviewed for abuse of discretion].)

We find no abuse of discretion. Mother's burden in her petition—filed more than two years after the children were removed from her physical custody, and nearly six months after the 18-month review hearing—was not just to show some degree of change, but to show this is one of the "extraordinary cases" where extending reunification services past the statutory limits might be appropriate and in the children's best interests. Her declaration shows some degree of change: she was sober, she was no longer living at

---

continuance would not be 'contrary to the interest of the minor' (*id.*, subd. (a)(1)). In evaluating the minor's interest, the court 'shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' (*Ibid.*)" (*Michael G.*, *supra*, 14 Cal.5th at p. 632.)

[8] *Michael G.* cited examples of "cases where a parent never receives reunification services or a reunification plan over the 18-month reunification period," where "the parent was hospitalized for most of the reunification period but demonstrated an 'impeccable record of visitation and efforts to comply with the reunification plan," and where "the parent sought a continuance to complete a program required by the reunification plan that was otherwise impossible to finish in time." (*Michael G.*, *supra*, 14 Cal.5th at pp. 632-633.)

maternal grandfather's house or living with father, she renounced "spanking" as a form of discipline, and she acknowledged that she had "allowed a toxic environment to continue," but had learned through services new skills "to become a supportive and dependable mother." Nevertheless, this does not show the extraordinary circumstances required to delay the section 366.26 hearing to allow for more services beyond the statutory limits. There is no dispute mother was offered adequate services. No external force prevented her from completing her case plan within the statutory period. On the contrary, she (and father) continued to fail to recognize and ameliorate safety threats to the children, leading to CFS involvement that motivated the department to request her services be terminated at the 18-month review stage.

Moreover, even in mother's declaration, she continued to minimize the safety issues that led to the dependency. "Spanking" is one thing; beating a child with a belt, bamboo stick, and an extension cord is quite another. "[S]teady employment in the landscaping field" is one thing; continued economic dependence on a maternal grandfather who was ordered to have no contact with the children because of the danger he presents is quite another. Allowing a "toxic environment to continue with the hopes that it would change" is one thing; subjecting children to ongoing domestic violence and failing to protect them from sexual abuse is quite another. We find no basis to disagree with the juvenile court's analysis, that mother had shown only that she was "beginning to acknowledge" the problems that led to the dependency, or its conclusion that this was an insufficient showing.

16

It was well within the scope of the juvenile court's discretion to find mother failed to allege sufficiently changed circumstances to justify further delaying permanency for additional reunification services, or that such an order would promote the children's best interests. As such, her petition was properly denied without an evidentiary hearing.

B. *Beneficial Parental Relationship Exception*

"By the time of a section 366.26 hearing, the parent's interest in reunification is no longer an issue and the child's interest in a stable and permanent placement is paramount." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348, disapproved on another ground by *Caden C.*, *supra*, 11 Cal.5th. at p. 635.) Adoption is the Legislature's preferred permanent plan. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*Jasmine D.*, at p. 1350.)

To avoid this outcome, the parent must show that termination of parental rights "'would be detrimental to the minor' due to any of certain specified circumstances." (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249.) One circumstance, the parental bond exception, applies where the parent can show they "have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) There are three elements to this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which

would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 631, italics omitted.)

"The first element—regular visitation and contact—is straightforward. The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.'" (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) For the second element, courts may consider "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.'" (*Ibid.*) As for the third element "in assessing whether termination would be detrimental, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Ibid.*, italics omitted.) This analysis requires the court weigh the potential harm to the child from losing a beneficial parental relationship against the benefits of a new, stable home, which may alleviate those harms to "make the loss of a parent not, at least on balance, detrimental." (*Caden C.*, at p. 633.)

On review, we apply the substantial evidence standard to the findings on the first two elements and a hybrid standard for the third. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.) Specifically, we review for abuse of discretion whether termination of parental rights would be detrimental to the child because of the beneficial parental relationship. (*Id.* at p. 640.) In so doing, we review any express or implicit factual findings underlying that discretionary decision for substantial evidence. (*Ibid.*) We look only at the evidence

18

admitted at the section 366.26 hearing.  (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 207-208.)  We "presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 576.)  This hybrid standard embodies the principle that as the reviewing court, we may not "substitute [our] own judgment as to what is in the child's best interests for the trial court's determination in that regard." (*Caden C.*, at p. 641.)

The department does not contest the juvenile court's finding that the parents satisfied the first two elements, and we agree that the evidence is sufficient to support that finding.  Therefore, the only question is whether the juvenile court erred when it found they failed to meet the third element.  We find no error.

Sufficient evidence supported an implied finding that adoption would bring significant benefits.  The children were well bonded to their respective prospective adoptive parents, the attachments were mutual, and the children were thriving in their new homes.  L.M. was old enough to express a strong preference for adoption, and her prospective adoptive parents felt the same.  R.C., too, said she wanted to live with her prospective adoptive parents "'forever.'"  I.C. was too young to express an opinion about adoption, but the social worker observed that she, like R.C., demonstrated by her behavior that she was happy and thriving in the care of her prospective adoptive parents.  Making these secure and loving relationships permanent would benefit the children.

Against these findings, the parents have not shown that the harm from terminating the children's parental bonds outweighs the benefits adoption would provide. (*Caden C.*, *supra*, 11 Cal.5th at p. 636 [under third element, "the parent must show that terminating [a substantial, positive, emotional] attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home"].) We reject their arguments inferring from the juvenile court's minimal discussion of its reasoning that it failed to conduct the balancing analysis required by *Caden C.*, particularly given its express acknowledgment that *Caden C.* controls the analysis. (See *Caden C.*, at p. 640 [juvenile court "may make explicit or implicit findings" in considering third element].) As the parents emphasize, their visits with the children were generally positive, the parents had made significant progress by participating in services, and the bonding study showed a strong positive relationship between mother and the children that could be detrimental to sever. Nevertheless, this does not compel the conclusion that the parental relationships were so beneficial to the children as to compel the conclusion that the detriment of severing them outweighs the benefits of adoption, as would be required for us to disturb the juvenile court's balancing of the competing considerations. (See *Caden C.*, at p. 641.)

Given the evidence, we do not question the juvenile court's conclusion that father shared a beneficial bond with R.C. and I.C. and mother shared a beneficial bond with R.C., I.C., and L.M. However, viewing that same evidence in the light most favorable to the court's order, we find nothing unreasonable in the court's determination that severing

those parental bonds would not be so detrimental as to counsel against adoption.

Accordingly, we affirm the order terminating parental rights.

DISPOSITION

We affirm.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAPHAEL _____

J.


We concur:

McKINSTER _____

Acting P. J.

LEE _____

J.